May it please the Court, Judah Lakin on behalf of Petitioner Juan Sanchez-Perez, who joins us in the courtroom today, along with his mother. I'll aim to reserve two minutes for rebuttal. Before turning to the Court's focus order, I would like to briefly mention three additional facts that I think take this case out of the normal and into the extreme, and deviate in the extreme from the norm under this Court's guidance. Are these facts in the Record Council? Yes, of course, Your Honor. But thanks for clarifying. Yes, so the three additional facts that I'll just quickly go through and then I'll turn to the Court's focus order are, one, Juan's inability to immigrate otherwise. So if Juan is removed despite being the husband of an LPR and the son of an LPR, he has no way to otherwise lawfully immigrate. And that's because he took a brief trip to Mexico due to the tragic loss of his brother to help bury him. Second is the fact that he has a very unique relationship with his mother, and that's predicated on profound loss. At the age of 12, he helped his mother navigate the loss of his father and her husband. And then as an adult, again, as I just mentioned, he helped her navigate the loss of her adult son in a tragic car accident. And third is the fact that, unlike many cases which involve family separation, this case will involve the complete sort of termination of the family unit. His wife, Maria, credibly and persuasively testified that their relationship of over 20 years will not survive his removal, and so their marriage will end. And so I think those three facts, in addition to the adoption issue, which I'll turn to now, are key in sort of taking this case out of the norm and into the extreme. So as to the adoption issue, with respect to question one, we think the answer, at least on these facts and in this particular case, that yes, the inability to adopt constitutes exceptional and extremely unusual hardship. Why is it the loss of a child, a hypothetical child through adoption, different than the loss of a child when there's separation of a family? So I think the difference – I think there's a few differences, Your Honor. So first, we're not talking about a situation in which there's already a family unit, and then the family has to deal with separation and figuring out how to sort of navigate living in two different places. Here we're talking about the complete deprivation of the ability to start a family and become a parent. Doesn't that happen when there's at least two legitimate children when the family is separated? No, I don't think so, Your Honor. I mean, if the kids are already in existence, then they have – If there are no kids in existence, does that happen? Well, then I think the reason that adoption is unique is because, you know, if hypothetically Juan was not sterile and Juan and Maria were able to conceive biologically, and I mean, again, the record here makes clear that their marriage will terminate. But just hypothetically, if their marriage were not going to terminate, she could travel to Mexico, they could conceive biologically, and they could figure out how to have a family despite being in two different places. That's not true via adoption. I don't understand this, because what would prevent her from adopting on her own? Well, I think the record establishes that she is not able to do that. She credibly and persuasively testified that when asked, will you be able to adopt, she said no. Why? Yes, Your Honor. Why? I mean, I think people adopt now, single children. I mean, single parents can adopt. Well, that may be – Where does she live? Is there a law preventing her from adopting? Well, Your Honor, I think we're limited to the record here, and the record here establishes that she both can't and won't adopt without Juan. Her dream, which you made clear, was to start a family with Juan. She outlines that she feels like she needs two parents to raise a child, and she also outlines sort of the emotional and financial loss that she'll suffer in the event that Juan is removed, including the end of their marriage. And so, I mean, sure, it may be true that hypothetically – Why couldn't she go to Mexico? Yeah, why does the marriage end? Why does her dream end? I mean, part of the issue, counsel, is I think the record has these kind of absolute statements from your clients, but they sort of beg the question a little bit. You know, why can't she adopt? Why can't she move to Mexico? It's just – it's sort of, you know, the marriage will end, right? And if we're looking at the board's review deferentially, I'm not sure that that – that we just have to take that as an established fact. Well, I guess I would take issue with that, Your Honor. I mean, they provided – the IJ referred to their testimony as very credible. The Department of Homeland Security had a chance to cross-examine them to try and develop these facts or prove that they weren't otherwise telling the truth, and they didn't do that. Nor did the immigration judge. In fact, the immigration judge tried to hurry them along, saying, no, I find all of this testimony very credible. You don't necessarily need to repeat it. And so I don't think it would be in the province of this court to all of a sudden look at the facts well-established in the record and say, oh, well, we wish there were more evidence. I mean, nobody asked them for more evidence. If somebody – if the immigration judge had said, okay, well, you're testifying that you won't adopt on your own, you know, can you prove why that is or can you show us a state law or what have you? And then they were put on notice and had the opportunity to do that. Sure, but nobody did that here. But let me illustrate another one, the fact that I guess Juan's mother has been traveling to Mexico every year. Is that right? And I think has a home in Guadalajara. That's my understanding, Your Honor. But one of the declarations said she wouldn't be able to travel anymore. And so it kind of begged the question for me as I was looking at that, why? If she's been voluntarily traveling every single year to be in Mexico, what would somehow prevent the travel from occurring now? Well, again, I think that's explained in the record. It's explained by the fact that Juan is the person who pays for that travel, and Juan will no longer be able to pay for that travel in Mexico. He explains that he'll be unable to find work. It will be much more difficult. He has arthritis. He's over 40. There's age discrimination. So they establish, like, why she won't be able to travel in addition to the fact that she's aging and has these various medical conditions and therefore travel will be more difficult. So I actually think those are explained in the record. But, again, it seems this court is sort of asking for additional evidence at this point that nobody asked for at the trial level. So I think if this court finds – Yeah, but I guess I'm not sure why that would be appropriate at this juncture. I mean, the immigration judge accepted it and the Board of Immigration Appeals accepted it. And so, like, it's established in the record. There's nothing – you know, I guess the situation would be different if there were countervailing evidence, if somebody had put in evidence or cross-examined them or presented stuff. This comes up all the time in cases when the court has been very clear. If there's no countervailing evidence, nothing to sort of cast doubt on what the respondents credibly and persuasively testified to, then I'm not sure why we wouldn't accept it. What the agency held is that the evidence that you put forth was not sufficient to meet the burden of establishing that these hardships are exceptional and extremely unusual. That's the legal determination, even accepting all your evidence, because you're talking about financial and emotional loss. That's ordinary consequences of this kind of situation. It's not an extremely and exceptional unusual consequence from this kind of deportation. That's your burden, your legal burden. I mean, I'm frustrated with this because I agree, you know, on a human level, this is going to be very hard on all of them. But there's a standard for cancellation that you need to meet. Yes, Your Honor, but I guess I would just take one sort of additional run before my time expires, which is that the inability to sort of adopt and the inability to have a family, it's more akin to what this court has described about the inability to obtain employment at all, or the board has described about the inability to obtain an education. It's sort of it's transformative of your life. I mean, anybody who is a parent knows that becoming a parent completely transforms all aspects of your life. And being deprived of that is it's an aberration. It's outside of the norm. I mean, I've read all of the cases that are cited in the briefs that talk about the normal hardships. And those deal with, you know, some separation, some financial loss, some emotional loss. I mean, we have those aspects here, but we have something extremely unique, which is an individual who's sterile and who otherwise will not be able to start a family. And that their dreams have been on hold for the past 10 years, since he applied for cancellation in the last seven years, whereas he sought to vindicate his rights. I see I'm running up against my time, but I do think sort of. I will tell you, you're talking to a bench of parents. So we have all had the experience of having a family. But what I'm saying is that. There seems to be some artificial impediments to their having a family. And also, can you point me to any case law talking about the inability to have a child together? No, I would just make two final points on this. So one is I'm also a parent, and I guess I would encourage all of you to sort of think about what it would be like for you not to be able to be a parent and how that deviates in the extreme from what most people who have already established relationships with their children or have children have to experience. It's very different. So imagine what that loss would be like for someone who has dreamed their entire life of having children. And second to your question of whether there's case law sort of already supporting this, I think the answer, to my knowledge, the answer is no. But I think that cuts in our direction, which, again, the standard under Gonzalez-Juarez is it's an aberration from the norm. This is an aberration from the norm. We couldn't find a single case on these facts because no one has presented them before. So that in and of itself shows that this is an aberration. I see that my time has expired. Thank you. We'll give you a little time for rebuttal. Thank you. Good morning. May it please the Court. Jeffrey Leist appearing on behalf of the Attorney General. Substantial evidence supports the agency's denial of the petitioner's application for cancellation of removal where he failed to demonstrate the requisite hardship. Turning first to the two questions the Court posed to the parties, I actually think that the second question kind of takes primacy because whether or not the facts exist in the record kind of informs on whether it's actually necessary to determine whether hypothetically they may meet the standard for the level of hardship. And here we have insufficient evidence in the record to actually show an inability to adopt if the petitioner is removed. We have a couple of instances in testimony as well as the declarations which say that this is their belief. They believe that they had to both be LPRs and that if Juan was removed to Mexico that the petitioner's wife would not be able to adopt on her own. But there's nothing actually in the record to substantiate that belief. And when it comes to things that are kind of outside of an applicant's expertise like the extent of a medical hardship or a mental health hardship, something beyond their own testimony is required. In the matter of JGG, excuse me, the Board held that for medical hardships. Simply testifying as the existence of the hardship doesn't really inform on the severity, so you need some kind of medical documentation to establish that. Wilkinson and the Third Circuit held the same thing for mental health conditions, that a layperson's understanding of what something may be is not going to be sufficient to actually demonstrate the severity of the condition. I think this is a similar situation, Your Honor. We are talking about a discrete legal issue. What are the requirements for? What are the disqualifications for adoption in the state of California or potentially other places in the United States? There's nothing in the record to actually establish that. And so because there is insufficient evidence in the record to actually demonstrate that there is an inability, the court doesn't have to actually answer the first question of whether or not hypothetically the inability to adopt could be sufficient hardship. Counsel? Yes. I mean, do you agree as a theoretical matter that the inability to adopt a child without a spouse living in the home would be an unusual hardship? Well, I think it depends on the facts of the case, Your Honor. And I think that this case actually presents a poor test vehicle for that because in addition to the lack of any evidence to show an inability, there's not evidence in the record to establish an ability. This is purely speculative at this point in time. The petitioners have expressed a desire to pursue this, but there's no actual evidence that they've consulted with an attorney, that they've gone through any of the process, that they've been informed that they're actually eligible to do this or that they would meet the requirements. And there's also, unfortunately, some derogatory information in the record. The petitioner has a criminal history. Now, I don't know that that's disqualifying for couples adopting. The petitioners are both over the age of 50 at this point in time, and many adoption agencies put a cap on the age for prospective parents at 45 or 50. There may be other avenues available for them, but this is not a guarantee that this is actually something that would come to pass. So I think that whether or not there may be a situation where, for example, a cutting off an application that's already been through several steps could constitute a hardship, that is not present in this case because the process has not even begun. What we're talking about is an expressed desire to pursue something, which itself is a discretionary benefit. Adoption is not a guarantee. It's something that requires an application process and a screening process and a selection process. So it's not as if, even if you were to grant cancellation of removal in this case, that the end result that they're looking for would actually come to pass. And cancellation of removal is not a conditional status. You can't grant it with the understanding that, you know, it's only because you're seeking to apply for adoption or any other discretionary issue you may have. And you can't claw it back if that's unsuccessful. And taking kind of a step further back, and I don't mean this is not directed at the petitioners, but there could be a hypothetical family who they express this desire to adopt and they're granted cancellation of removal. And then their circumstances change. And, you know, a medical incident happens or there's spousal discord or whatever it may be and they choose not to go forward with it. Again, cancellation of removal is not a conditional status. So you can't, there's no way of actually policing or ensuring that people follow through. And if we're concerned with the stated desire to explore an option or pursue an adoption in this case, there are unscrupulous people out there who would simply take that and run with it. They would state that this is what they want to do with no intention of actually following through. And so I think that when we're talking about a speculative form of discretionary benefit, that there's no evidence in the record that is actually in the offing, I think that it would not constitute exceptional, extremely unusual hardship. The remaining hardships in the case, I think, do not deviate in the extreme from what is typically happens when a close family member is removed. Financial hardship is to be expected. The emotional hardship is to be expected. And it doesn't, I think it's important to note, it doesn't discount the depth of the feelings that the petitioner has and the hardship that he will face. But the issue is whether or not it meets the legal standard that the board and this court have standard. And I do not believe that it has done so in this case, Your Honor. Can I have you switch gears for a second? What do we do with the defective notice of hearing? Sure. And then how the board approached it, because there's been supervening authority that would suggest we should remand it back to the board to apply the correct, the supervening legal standards now. Well, I think that the key to that, Your Honor, is that in matter of Fernandez, which was issued after the board issued its decision here, they held that it's a claims processing rule that needs to be raised timely, and that it is timely raised if it is before the close of pleadings. In this case, the pleadings were completed in 2016. The challenge to the sufficiency of the NTA wasn't until 2019. So I would argue that even if the court were to remand it, it would essentially be futile because the board's already spoken on the issue and the petitioner clearly does not actually meet that. But this is exactly what happened in our case in Suayte, Oriano, where the NTA was statutorily defective and the brief to the BIA said that there's a statutory defect the rest of the argument that it then deprived the BIA, you know, of jurisdiction was not correct, but that was enough to preserve the argument, and that seems to me to be the exact same thing, that it has been properly exhausted. So I don't know why it would be futile. I think that there was a subsequent case, the name of it has actually escaped me, but it said that Suayte, Oriano was kind of a unique situation in the way that the argument was presented to the agency, whereas I believe here that it was presented purely as a jurisdictional issue. It actually cited to Pereira and based it and acknowledged that Pereira was adverse to their position, but they were preserving the issue. So I think that it's a slightly different framing than it was in Suayte, Oriano. And that because... Even if that's correct, you know, arguments aren't waived, only claims are. So if there's been a challenge raised to the board's jurisdiction and that essentially tees up a statutory defect, shouldn't that be enough under our case law to send it back and have, you know, the board apply the intervening cases of Besteed-Hernandez and Madera-Fernandez and Niese-Chavez, the Supreme Court's decision? I mean, the court certainly can do that, Your Honor. I do believe that because of the way that the board decided Madera-Fernandez and the way the facts are presented in this case, that it seems pretty clear how the board is going to come out on this issue. But the court actually... I mean, they absolutely can remand for the board to do that in the first instance. Okay. I was thinking that this case might be different from Suayte because here the petitioner never raised the issue before the IJ. It was raised before the IJ, Your Honor. Pardon me, then I am wrong. Yes, so it was not raised during the initial pleadings. He pled to the sufficiency of the NTA, conceded an admissibility, all of that. But then while the case was still before the immigration judge, it was after the close of pleadings, but it was still before the IJ that he filed his motion to terminate and raise the issue jurisdictionally. Thank you very much. Are there any further questions? Thank you. Thank you. Mr. Lickey, we'll give you two minutes for rebuttal. I'll try and make three quick points on rebuttal. So first, as to your question, Judge Sanchez, this case is on all fours with Suayte-Ariana. The way that Suayte-Ariana determined that the issue was exhausted is identical here as we articulate in our brief. The argument was raised via sort of an explanation that the NTA was not going to be able to do that because of the deficient NTA, the arguments followed, and that's the exact same situation as Suayte-Ariana. I think if you read Suayte-Ariana and you read our briefs, you'll find that they're identical, and the government really doesn't have anything to offer as to why that wouldn't be binding here, and this Court should follow that. Can I ask, what do you make of counsel's argument that it would be futile to remand, that the Board would already do one type of path? Well, I guess I sort of make two responses. One, I guess I sort of think it's irrelevant. Suayte-Ariana did the exact same thing, and the same argument could have been made in Suayte-Ariana, that it would be futile. If it's a mandatory claims processing rule, then it should be applied, and it should be applied in the first instance by the Board of Immigration Appeals. So I think I'll sort of rest on our briefs on that issue because I think it's very clear, and I think if you read the case and our briefs, it really is on all fours. Second, I think something that has not been discussed yet but is prevalent in our briefing is the myriad legal errors that occurred in the assessment. So, you know, we think that the exceptional and extremely hardship standard was met, and that this Court should find it and remand for the additional factors. But if this Court disagrees, our briefing is clear that there were four, five, potentially six legal errors as to how the Board and the IJ assessed the evidence, whether it's the fact that they ignored medical hardship, whether it's the fact that they didn't do accumulative analysis, whether it's the fact that they entirely ignored the inability to adopt. There's no discussion of that whatsoever in the IJ's decision or the Board's decision. And so that's a separate way for this Court to remand back to the agency, provide them guidance, and say, you need a redo. And third, my final point is, I think, again, if the Court finds that the testimony, which was found credible and we believe is persuasive, was not sufficient, and that the burden was on them to provide some additional information, it strikes me that the appropriate remedy is to send it back to allow them to do that. Nobody put them on notice. They provided credible testimony, and nobody said, well, have you gone to a California state agency? Do you have any proof? And then they failed to provide that. This Court all the time finds credible testimony alone to meet someone's burden. Here they provided that, and no one even suggested that they needed to provide anything else. So the notion that this Court would now suggest that and can come up with a list of things they could have provided seems fundamentally unfair and a due process issue that would be violative of their rights. So again, we think this Court should find that the exceptional, extremely unusual hardship standard has been met, and then remand for the remaining cancellation factors. And the alternative, it should find that various legal errors were committed in the analysis and remand with instructions to redo the analysis. Thank you. Thank you. Counsel, thank you both for your helpful arguments. The matter will stand submitted.
judges: WARDLAW, BEA, SANCHEZ